## WESTERN ELECTRIC CO. v. STANDARD ELECTRIC CO.

(Circuit Court of Appeals, Seventh Circuit. January 25, 1898.)

### No. 422.

PATENTS—INTERPRETATION AND INFRINGEMENT—DYNAMO-ELECTRIC MACHINES.
The Scribner and Warner patent, No. 496,449, for an improvement in perforated pole-pieces for dynamo-electric machines, if valid at all, is very narrowly limited by the prior state of the art, as shown in the Hochhausen patent, No. 404,848, and others. And claim 2, which is for a machine "having consequent pole pieces cut away or perforated on a line coincident with a plane passing through the axis of the armature shaft, such perforations being symmetrical with regard to said plane, whereby a uniform magnetic field is produced, regardless of the direction of rotation of the armature," is not infringed by machines made under the Loveridge patent, No. 500,403. 81 Fed. 192, affirmed.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

Henry A. Seymour, George P. Barton, and Charles A. Brown, for appellant.

Francis W. Parker and Donald M. Carter, for appellee.

Before WOODS and JENKINS, Circuit Judges, and BUNN, District Judge.

WOODS, Circuit Judge. The ruling of the circuit court in this case was that the second claim of letters patent of the United States No. 496,449, issued May 2, 1893, on the application of Charles E. Scribner and Earnest P. Warner, to the Western Electric Company, as assignee, is so far limited by the prior art as not to be infringed by devices made by the Standard Electric Company in conformity with letters patent No. 500,403, issued June 27, 1893, to F. H. Loveridge. The opinion delivered (81 Fed. 192), it is conceded, displays "an appreciation of the points at issue," intricate as in some respects they have been made to appear, but is criticized because its review of the prior art is confined to the patent of Hochhausen, No. 404,848, which it is said, is without significance, because it is for an electric machine which has no pole-pieces. But that objection was considered, and, as we think, sufficiently answered, in the opinion, and, without going again into the details of the subject, we deem it enough to declare our concurrence in the views of the circuit court concerning that patent. A further examination into the prior art, perhaps,

might have strengthened, but could not have changed, the conclusion.

The two claims of the patent in suit are closely related, the one being for a process, and the other for a product or result of the employment of the process upon the pole-pieces of an electric machine; and it is evident, upon the face of the patent, that neither claim embodies a pioneer discovery, and, if invention is shown, it is of a very narrow scope. The specification describes, in general terms, a process for discovering variations or lack of uniformity in the lines of force cut by the coils of the armature of an electric dynamo when the resistance in the circuit is gradually cut out or shunted, and the brushes rotated, meanwhile, from the maximum to the minimum point of commutation. In the claim it is called:  .

"The method of creating a uniform field for the short-circuited portion of the armature coils of a dynamo, which consists in shunting the brushes from the maximum to the minimum, varying the resistance in the circuit as the said brushes are shifted, and maintaining during said shifting freedom from sparking at the commutator by shifting the brushes slightly from the position that they would occupy if the field were uniform, in order to determine the amount and character of the variation in the distribution of the magnetic lines of force, and then perforating the pole-pieces to the degree thus found to be necessary, substantially as described."

It will be observed that neither in the claim nor specification is there disclosed any means or method of determining different degrees of irregularity of force, discovered by the experimental movements of the brushes between the maximum and minimum points of commutation; and in this respect the process of this patent differs, apparently to its disadvantage, from the process shown in the earlier patents, Nos. 402,200 and 410,656, granted to J. G. Statter, in which a volt meter is used to obtain from the different positions of the brushes "relative indications of the electro-magnetic force of the current (which are also relative indications of the resultant magnetic intensity produced by the mutual action upon each other of the field magnets and the armature) flowing through the coils." If the process of Scribner and Warner differs otherwise essentially from the process of Statter, it is not perceived, and whether there are other differences it is not important for the present purpose to inquire. Reference is made in the specification of the patent in suit to the first patent of Statter, in which, though the process is explained, the claims are for a dynamo-electric machine or motor having one or more pole-pieces cut away or incised, to neutralize irregularities of force to prevent sparking as the brushes are shifted; but it is pointed out that the pole-pieces there shown are salient, and, consequently, the armature can be rotated only in one direction. "since when the poles are incised for rotation in one direction the lines of force will not be properly distributed for rotation of the armature in the opposite direction." The special and characteristic advantage claimed for the dynamo of the patent is that its armature rotates in either direction, with no necessity for other change except the obviously expedient if not necessary one of making the brushes reversible. This is demonstrated by the statement in the specification that "our invention consists in producing, in the field, lines of force uniformly distributed as to generating or current producing effect throughout the arc or

segment traversed by the coils of the armature opposite the faces of the different pole-pieces, whereby the machine is made capable of running in either direction." The claim is for "a dynamo-electric machine having consequent pole-pieces cut away or perforated on a line coincident with a plane passing through the axis of the armature shaft, such perforations being symmetrical with regard to said plane, whereby a uniform magnetic field is produced, regardless of the direction of the rotation of the armature, substantially as described." It appears from the file wrapper that a claim in the same terms as this, except that it contained the words "at the center" immediately after the word "perforated," and did not contain the clause, "such perforations being symmetrical with regard to said plane," was rejected as containing nothing patentable over the references Statter, No. 402,200, and Hochhausen, No. 404,848. Those patents show ample knowledge of the irregularities in the field of force, and of the distortion of the lines of force due to armature reaction, to which imperfect short-circuiting and the consequent· sparking or burning are attributable, and also show the method, not essentially unlike that of the patent in suit, and applicable equally to salient and consequent pole-pieces, of making the field of force uniform. With a knowledge of the earlier patents in the art it could not be invention to produce uniformity in the field of force of a consequent pole-piece or pieces, and it is difficult to believe that it was not evident from the beginning that, in a pole-piece of ordinary form, the boring or cutting requisite for that purpose must be at or near the center, and, once the advisability of rotation in either direction was thought of, it must likewise have been manifest that symmetry of construction was essential, and that to accomplish the end it was only necessary that the pole-pieces be cut away or perforated symmetrically, and to the proper extent, "on a line coincident with a plane, passing through the axis of the armature shaft." To what extent the cutting or boring must go seems to be a matter of experiment in each case. The specification says that "every dynamo must have its pole-pieces specially constructed and adjusted, as no two dynamos contain the same character of iron with respect to magnetism." The one expert, on whose testimony the appellant relied, made repeated statements to the same effect. For instance, in his examination in chief, he said:

"This operation requires the exercise of caution and good judgment, because, to produce the desired result, the exact amount of metal necessary to the uniform distribution of the lines of force must be cut away, and one-half of such amount must be taken from each side of a line that is coincident with a plane passing through the axis of the armature shaft, in order that the dynamo shall run sparkless and maintain a steady current, which under all conditions of load, or when operated in either direction, shall always be the same in amount."

On cross-examination, after a similar statement, he said:

"In other words, there is just a correct amount of metal to be removed, and a correct disposition of that metal remaining, which will produce a uniform field, and any variation therefrom produces nonuniformity."

When asked whether the separation of the upper or north poles of the machine shown in figure 10 of the Houston patent, No. 258,648, tends to make the field more uniform than it would be if the poles

were not separated, he answered that that "could be determined only by experimental tests."

The proposition announced in Thomson-Houston Electric Co. v. Western Electric Co., 34 U. S. App. 186, 256, 16 C. C. A. 642, and 70 Fed. 69, that, "when such tests are necessary to distinguish one device from another, it is manifestly an impracticable, not to say dangerous, proposition that the making or using of either under a given patent may be declared to be an infringement of a different patent upon the other," would seem to apply with equal or greater force here. But, that aside, it is clear that the earlier electric machines, of which patents No. 184,966, to Holcombe; No. 233,047, to Thomson; No. 258,648, No. 272,256, and No. 286,612, to Houston; No. 330,836, to Johnson; No. 332,682, to F. G. Waterhouse; No. 335,998, to Fisher; and No. 389,029, to A. G. Waterhouse,—are examples, in which the pole-pieces were cut away or perforated or entirely severed at or near the line of the plane of the axis of the armature shaft, were or were not anticipations of the patent in suit according to the result of experimental tests, and, such tests not having been made, it remains a question of reasoning or conjecture, in the light of the evidence, whether the particular construction shown in any of the prior devices was such as to produce, or to tend in a substantial degree to produce, the desired uniformity in the field of force. It is not enough to exclude those patents from consideration to say that the incisions or perforations or separations of the parts of the pole pieces were intended, or were described as intended, for some other purpose than to produce a uniform field, as, for instance, for the purpose of ventilating the machine. Ventilation was necessary only to prevent or to restrict the consequences of sparking, which results from irregularities in the field of force; and in the light of the learning contributed by the experts it seems probable, if, indeed, not certain, that the beneficial effect accomplished was more the result of decreased irregularities in the field of force than it was of the ventilation, whether the patentees so understood or not. It was common knowledge that the distribution of the lines of force depended largely upon the form of construction or distribution of metal in the pole-pieces, whether salient or consequent; and that the reason why this was so was also well understood, if not otherwise proved, is demonstrated by the patents to Statter and Hochhausen. It is therefore not to be believed that when other and earlier patentees constructed electric generators or motors with pole-pieces incised, severed, or perforated at or near the center, or elsewhere, they did not know that the incision or other particular change of form given to the pole-piece would have a certain and definite effect upon the working of the dynamo, and whether they knew just what the effect would be, or why it would result, is immaterial. It was an inevitable result, and not merely an accidental phenomenon, like the formation of fat acid in Perkins' steam cylinder, which in Tilghman v. Proctor, 102 U. S. 107, 111, was declared to be of no consequence. Whatever others had done in the way of shaping pole-pieces, and whatever the effect upon the field of force of what was so done, before the patent to Scribner and Warner, the appellee had the right to do

84 F.—42

after the issue of that patent; and unless done by the process of that patent, which for the purpose of this statement is assumed to be valid, the machine produced could not be deemed to infringe the second claim in question, though shown by experimental tests to have pole-pieces with a uniform field of force. It is beyond doubt that the particular construction or adjustment of material used in the construction of the pole-pieces of the earlier patents had a direct effect upon the distribution and regularity of the lines of force, and the necessary inference is that in the machines which had, as most of them did have, incisions, perforations, or separations located at or near the center of the pole-pieces, and symmetrical, or nearly symmetrical, with reference to a line coincident with a plane passing through the axis of the armature shaft, the fields of force were thereby made in some degree more uniform, and that any one skilled in the art would have so understood before the patent in suit was granted or its contents made public. As already explained, it was well known in the art that sparking and like irregularities in the action of electric dynamos were due to unequal distribution and to distortion of the lines of electric force cut by the moving coils of the armature, and it was known, too, that the amount of distortion or irregularity of distribution of the lines depended, other things being equal, upon the form and proportion of parts of the pole-pieces. It was therefore open to every one to make his pole-pieces in any possible form for the purpose of producing a uniform field. There were known methods of overcoming the consequences of an irregular field, such as automatically variable brushes, an air blast at the point of the brushes to blow out the spark, and dividing the commutator into numerous segments, and connecting therewith correspondingly small coils of wire around the armature; but, to produce uniformity of the field, there was, as it was well understood, no way except to obtain the best adjustment of metal in the pole-pieces, and the accomplishment and determination of that result, if the statements quoted from the patent and from the testimony of the appellant's expert be accepted, depended and must continue to depend largely on experimental tests. A process for accomplishing the end might well be the subject of a patent, and possibly the discovery of an exact form of construction, possessing a distinct advantage over other forms, might also be protected by a patent (Caverly's Adm'r v. Deere & Co., 24 U. S. App. 617, 631, 13 C. C. A. 452, and 66 Fed. 305); but it is impossible, in view of the prior art, to concede to the appellant a monopoly of the right to produce a uniform field in a consequent pole-piece, by giving it a symmetrical shape of the character stated, in order that there may be rotation of the armature in either direction. · If the patent covers a pole-piece so incised or perforated as to have a uniform field, it covers one so shaped in the first instance, without boring or cutting, as to have a uniform field. That the device is not new, merely because rotation in either direction is made possible, is clear, because such rotation is shown in several of the prior patents already mentioned.

That the decree below should be affirmed we have no doubt, and it is so ordered.